IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
DELTA DIVISION

JAMES H. PHILLIPS                                                PLAINTIFF

v.                          No: 2:18-cv-00144 JM-PSH

SHEILA WOODARD, *et al.*                                DEFENDANTS

## PROPOSED FINDINGS AND RECOMMENDATION

## INSTRUCTIONS

The following Recommendation has been sent to United States District Judge James M. Moody, Jr. You may file written objections to all or part of this Recommendation.  If you do so, those objections must: (1) specifically explain the factual and/or legal basis for your objection, and (2) be received by the Clerk of this Court within fourteen (14) days of this Recommendation. By not objecting, you may waive the right to appeal questions of fact.

## DISPOSITION

### I.  Introduction

Plaintiff James H. Phillips, an inmate at the Forrest City Medium Federal Correctional Institution ("FCI-Forrest City"), filed this *pro se* complaint against defendants Sheila Woodard, M.D., M. Hickerson, Nurse Practitioner, and the United States of America on October 12, 2018.  *See* Doc. No. 2.  Phillips later filed an amended complaint.  Doc. No. 7.  He alleges that Woodard and Hickerson were

deliberately indifferent to his serious medical needs in violation of the Eighth Amendment under *Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971). Phillips sues these defendants in both their official and personal capacities and seeks monetary relief. *See* Doc. No. 7. He also asserts claims against the United States pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671-80, on grounds that the defendants' medical treatment was negligent.

Before the Court are motions for summary judgment and related pleadings filed by defendants Woodard, Hickerson, and the United States. *See* Doc. Nos. 42 - 47. Also before the Court is Phillips' motion for summary judgment and memorandum of law. Doc. No. 49. These motions are ripe for decision, and are the subject of this Recommendation. For the reasons set forth below, the Court recommends that the summary judgment motions of Woodard, Hickerson, and the United States be granted and the summary judgment motion of Phillips be denied.

## II. Legal Standard

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex v. Catrett*, 477 U.S. 317, 321 (1986). When ruling on a motion for summary judgment, the court must view the evidence in a light most favorable to

the nonmoving party. *Naucke v. City of Park Hills*, 284 F.3d 923, 927 (8th Cir. 2002). The nonmoving party may not rely on allegations or denials, but must demonstrate the existence of specific facts that create a genuine issue for trial. *Mann v. Yarnell*, 497 F.3d 822, 825 (8th Cir. 2007). The nonmoving party's allegations must be supported by sufficient probative evidence that would permit a finding in his favor on more than mere speculation, conjecture, or fantasy. *Id.* (citations omitted). An assertion that a fact cannot be disputed or is genuinely disputed must be supported by materials in the record such as "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . .". Fed. R. Civ. P. 56(c)(1)(A). A party may also show that a fact is disputed or undisputed by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case. *Othman v. City of Country Club Hills*, 671 F.3d 672, 675 (8th Cir. 2012). Disputes that are not genuine or that are about facts that are not material will not preclude summary judgment. *Sitzes v. City of West Memphis, Ark.*, 606 F.3d 461, 465 (8th Cir. 2010).

### III. Phillips' Allegations

In his amended complaint, Phillips claims that the defendants failed to use reasonable care after he underwent a Transurethral Resection of the Prostate ("TURP") on August 14, 2017. Doc. No. 7 at 5. He alleges that discharge instructions were provided to Health Services upon his return to FCI-Forrest City, and that Woodard and Hickerson failed to review the instructions with him and failed to follow those instructions. *Id.* According to Phillips, the after-care instructions "included instruction on follow-up time, what to do if complications occurred." *Id.* at 6. Those instructions identified complications such as constipation, increased bleeding, swelling of the penis or scrotum, pain, and infection. They identified the medications he was to take, and they instructed that a follow-up visit be scheduled with the urologist within 7-10 days of discharge. *Id.* Phillips complains that Woodard prescribed aspirin, which he was not supposed to be given; that Hickerson ordered him to purchase stool softener which increased bleeding; that he was not given a soft chair as instructed until nine months after surgery; and that he was not provided a special diet to minimize constipation. *Id.* Finally, he complains that he suffered from an infection for many months, resulting in ongoing health complications. *Id.* Phillips alleges that Woodard and Hickerson were negligent and deliberately indifferent by failing to follow the post-op instructions.

## IV.  Defendants' Motions for Summary Judgment

### A.  Undisputed Facts

The following undisputed material facts are taken from the statements of undisputed facts submitted by the defendants (Doc. Nos. 44 & 46), the declaration of Dr. Te Cora Ballom (Doc. No. 46-1), and voluminous medical records (Doc. No. 44-1; Doc. No. 46-1).[1]  Phillips was incarcerated at FCI Forrest City on October 23, 2015, and underwent a physical examination two days later.  Doc. No. 46-1 at 2-3.  Based on a reported history of urinary frequency, blood work and a urinalysis were ordered, and Terazosin was prescribed.  Although the urinalysis was normal, a prostate test was slightly elevated, and Phillips was therefore referred to a urologist. *Id.*

Phillips saw a urologist on April 18, 2016, and was diagnosed with Benign Prostatic Hyperplasia ("BPH"), outflow obstruction, nocturia, and urinary incontinence.  Doc. No. 46-1 at 3.  The urologist prescribed Tamsulosin and

---

[1] Because Phillips failed to specifically controvert the facts set forth in defendants' statements of uncontested facts, Doc. No. 56, those facts are deemed admitted. *See* Local Rule 56.1(c); *Nw. Bank & Tr. Co. v. First Ill. Nat'l Bank*, 354 F.3d 721, 725 (8th Cir. 2003) ("Local Rule 56.1 exists to prevent a district court from engaging in the proverbial search for a needle in the haystack.).  Phillips was notified that if he responded to the defendants' motions for summary judgment, he must "also file a separate, short statement setting forth the disputed facts that he believes must be decided at trial. . . . While plaintiff is not required to file a response to the motion for summary judgment, if he does not respond, the Court can assume that the facts set out in the statement of facts are true."  Doc. No. 48.

recommended a follow-up ultrasound in one month.  Although a consult was submitted for the follow-up visit, it did not take place until September 20, 2016.  An ultrasound at that visit led to a diagnosis of an abnormal bladder.  The urologist recommended a Transurethral Microwave Therapy procedure and advised Phillips to continue taking Tamsulosin.  *Id.*  Phillips saw the urologist at a follow-up appointment on February 6, 2017, at which time Phillips decided to undergo a TURP procedure.  That procedure took place on August 14, 2017.  *Id.* at 4; *see also* Doc. No. 44 at 1.  After an overnight hospital stay, Phillips was discharged to FCI-Forrest City.  He was examined by Woodard, at which time Phillips complained of nausea, being lightheaded, and pain on walking and urinating.  *Id.*  He also reported some bleeding on urination.  Woodard prescribed Phenergan and Percocet for five days. *Id.* She also renewed medication orders for, among other medications, one aspirin daily.  Doc. No. 46-1 at 65.  Records from St. Francis Hospital, including an operative report and a pathology report, were received when Phillips returned to FCI-Forrest City, and Woodard reviewed and signed off on them.  *Id.* at 69-72. Additionally, a nurse who assessed Phillips when he returned to FCI-Forrest City documented that he returned from St. Francis "with paper work."  *Id.* at 66.  Woodard reviewed that report and cosigned it.  *Id.* at 66-68.

The paper work Phillips possessed upon return from St. Francis included discharge instructions indicating that he was to follow up with the urologist in 7-10

days and discontinue aspirin, recommending the use of a soft cushion chair, noting that an increase in fluids could reduce constipation, recommending more fiber in his diet, and indicating that a provider may wish to prescribe a stool softener. Doc. No. 46-1 at 4 & 73-92. The instructions did not order a special diet. *Id.* at 4. Specifically, the document "Transurethral Resection of the Prostate, Care After" provides that "[c]onstipation can be minimized by increasing the amount [of] fluids and fiber in your diet. Your caregiver also may prescribe a stool softener." *Id.* at 85. "When sitting, you may want to sit in a soft chair or use a cushion." *Id.* Risks and complications were identified, including infection, bleeding, difficulty controlling urination, and scarring, which may cause problems with urine flow. *Id.* at 87. St. Francis Hospital discharge instructions directed Phillips to "Resume Normal Home Diet." *Id.* at 73.

Phillips was seen at Health Services at FCI-Forrest City on August 25, 2017, for dizziness and was found to have a low standing blood pressure. Doc. No. 46-1 at 4 & 94. The nurse on duty called Hickerson, who ordered IV fluids. *Id.* at 94. After he received the IV fluids, Phillips was released with instructions to return to sick call as needed. *Id.* He returned the following day for a follow-up on his vital signs, his blood pressure was normal, and he reported feeling better. *Id.* at 4 & 98.

Hickerson evaluated Phillips on September 13, 2017, as a follow-up to his TURP procedure. Doc. No. 46-1 at 5 & 102-104. He reported improvement in

urinary frequency, urinary urgency, and nocturia. He continued to have incontinence when sneezing, coughing, or moving around. Hickerson ordered a urinalysis which identified an infection, and she prescribed Ciproflaxin, an antibiotic, for ten days. She also submitted an urgent urology consult request.[2] *Id.* at 5.

Phillips was seen at FCI Forrest City Health Services again on September 25, 2017. Doc. No. 44 at 2; Doc. No. 44-1 at 14-15. He reported pain on urination and in his lower back. *Id.* A urinalysis was done, and at a follow-up visit the next day, Hickerson ordered additional antibiotics. *Id.* Phillips saw Hickerson again on September 29, 2017, for complaints of burning on urination, malaise, and nausea. Doc. No. 44 at 2; Doc. No. 44-1 at 18-21. Hickerson consulted with Woodard, and sent Phillips to the emergency room for possible pyelonephritis related to the TURP procedure. *Id.* At the emergency room, he was diagnosed with back pain, prostatitis, and urinary tract infection ("UTI"). Doc. No. 44-1 at 22-24. He was prescribed Keflex, an antibiotic, and advised to continue Macrobid, another antibiotic, with a

---

[2] The Court notes that Phillips did not see the urologist within 7-10 days after surgery as recommended. He saw the urologist for follow-up on November 13, 2017, three months after surgery. After Hickerson's follow-up examination on September 15, 2017, and before Phillip's follow-up visit with the urologist on November 13, 2017, however, Phillips was seen by Health Services at FCI-Forrest City on four occasions, and was treated in the emergency room on one occasion. Doc. No. 46-1 at 5-6; Doc. No. 44 at 2-3.

plan to follow up with his urologist in one week.[3]  *Id.*  Woodard reviewed the discharge instructions.  Doc. No. 46-1 at 5; Doc. No. 44 at 2.

Hickerson evaluated Phillips again on October 6, 2017, for his urinary problems.  Doc. No. 46-1 at 5 & 116-119.  A urinalysis was done, and new antibiotics were ordered.  Hickerson noted that the September 13 urgent urology consult request had been approved and was pending scheduling.  *Id.*  Hickerson next saw Phillips on October 25, 2017, for his ongoing UTI and cystitis.  *Id.* at 121-123.  Phillips continued to complain of burning on urination and diarrhea due to the antibiotics he was taking.  *Id.*  His antibiotics were discontinued and a new antibiotic, Bactrim, was prescribed.  *Id.*  Urinalysis showed a small amount of leukocytes and a trace of blood.  *Id.*  Hickerson noted that the urgent urology consult had been scheduled.  *Id.* at 5-6 & 121.

Phillips finally saw his urologist for post-surgical follow-up on November 13, 2017.  Doc. No. 46-1 at 6 & 126-130.  His Flomax was discontinued, Oxybutynin was prescribed, and a follow-up bladder ultrasound was recommended in one month.[4]  *Id.*; Doc. No. 44 at 3.  The urologist's notes from this visit state that Phillips reported no fever or chills.  Doc. No. 46-1 at 129.  They also noted that post-TURP

---

[3] An urgent urology consult had already been requested September 13, 2017.  Doc. No. 46-1 at 103.

[4] It does not appear that Phillips had a follow-up ultrasound until February 5, 2018, two and a half months after a one-month ultrasound was recommended.

Phillips "had UTI, off of antibiotics for about 1 week . . ." *Id.* The urologist's assessment included urinary incontinence and nocturia. It did not include a finding of ongoing infection. *Id.* at 129-130. Hickerson noted the recommendations from Phillips' urology visit. *Id.* at 6 & 134-136.

Phillips was next seen at Health Services on December 11, 2017, by nurse Loveday with a complaint of constipation. Doc. No. 46-1 at 6 & 138-141. He was advised to increase fluids, fiber, and purchase a stool softener at the commissary.[5] *Id.* Hickerson reviewed and co-signed the medical report of this visit. *Id.*

Phillips was next seen by Health Services on January 9, 2018. Doc. No. 46-1 at 6 & 143-144. He complained he could not sit, stand, or walk for short periods of time, and he had a film in his urine. *Id.* Vital signs and urinalysis were normal. *Id.* The consult report notes that he was on Indomethacin for pain management, and he was instructed to return if he noticed any symptoms of a UTI. *Id.* Phillips returned on January 22, 2018, complaining of blood in his stool. *Id.* at 6-7, 146-148. He was evaluated by Health Services for this problem the following day, and was diagnosed with a small hemorrhoid as the cause for the bleeding. *Id.* at 7 & 150-152. He was told to use stool softener suppositories. *Id.*

---

[5] This was the first time Phillips was told to take a stool softener since his TURP procedure.

On February 5, 2018, Phillips saw his urologist. Doc. No. 46-1 at 7, 154-159. The urologist adjusted his Oxybutynin prescription to reduce incontinence and nocturia. *Id.* He discontinued the Oxybutynin ER, which may have caused Phillips' constipation.[6] *Id.* There were no signs of infection, and a bladder ultrasound was normal. *Id.* Woodard reviewed the urologist's orders. Doc. No. 44 at 3. On February 9, 2018, Hickerson submitted a consult request for a three-month urology follow-up. *Id.* at 7 & 164-165.

On March 8, 2018, Hickerson saw Phillips at Health Services for burning eyes and low back pain. Doc. No. 44 at 3; Doc. No. 44-1 at 44-54. She ordered an optometric exam and low back x-rays. *Id*. Phillips had the optometric exam on March 13. Doc. No. 44 at 3; Doc. No. 44-1 at 47-49. Woodard reviewed the encounter report and Phillips' lab work and x-rays. *Id.*

Phillips had a follow-up visit at Health Services on March 28, 2018. Doc. No. 44 at 3; Doc. No. 44-1 at 55-58. He complained of radicular right leg pain. *Id.* Hickerson ordered new medications for the back pain and provided a cane to Phillips. *Id.*

---

[6] Upon return to FCI-Forrest City, Health Services incorrectly noted that the Oxybutynin ER was to be continued. This error was corrected four days later, the Oxybutynin ER was discontinued, and the Oxybutynin was changed to a smaller dose to comply with the urologist's order. Doc. No. 46-1 at 7.

On April 6, 2018, Woodard reviewed lab work on Phillips, and on April 10, she enrolled him in the Endolipid Chronic Care Clinic.  Doc. No. 44 at 3-4; Doc. No. 44-1 at 58-63.  The next day, Hickerson saw Phillips in Health Services.  Doc. No. 44 at 4; Doc. No. 44-1 at 64-66.  His lower back pain was improved.  After examining him, Hickerson entered new medication orders.  *Id.*

Woodard saw Phillips on May 22, 2018, for a Chronic Care visit, at which time he complained of hemorrhoids.  Doc. No. 44 at 4; Doc. No. 44-1 at 67-70.  Woodard examined Phillips, reviewed his labs, and ordered atorvastatin for hyperlipidemia.  *Id.*

Phillips saw his urologist again on May 30, 2018.  Doc. No. 46-1 at 7-8 & 167-171.  He had a normal bladder ultrasound.  He reported no fever, chills, excessive headache, significant weight loss, exercise intolerance, abdominal pain, diarrhea, or vomiting of blood.  His appetite was normal.  He was prescribed Colace for constipation and was continued on Oxybutynin for incontinence.  *Id.*  Hickerson reviewed the urology report and submitted a urology consult request for six months, or November 30, 2018.  *Id.* at 7-8 & 172-175.  Woodard reviewed the urology report as well.  *Id.*; Doc. No. 44 at 4.

On June 12, 2018, Woodard reviewed Phillips' lab work.  Doc. No. 44 at 4.

On August 4, 2018, Health Services staff noted that Phillips had been refusing his Oxybutynin.  Doc. No. 46-1 at 8 & 177-178.

On August 8, 2018, Phillips notified Health Services that he was going to refuse an upcoming surgery and colonoscopy. Doc. No. 46-1 at 8 & 180. He stated a belief that an error occurred during the TURP procedure which caused his hemorrhoids. *Id.* The medical records produced do not indicate any error in the TURP procedure or any relationship between any error and hemorrhoids. *Id.* at 8.

On August 17, 2018, Phillips was seen in Health Services to discuss his non-compliance with his medication. Doc. No. 46-1 at 8 & 182-185. He explained to Hickerson that he was non-compliant because of the side effects of the medication, which worsened his constipation and bleeding hemorrhoids. The two also discussed that Phillips was down and having a hard time because of the incontinence, rectal bleeding, and having to wear diapers. He was embarrassed over accidents he had in recreation and at school. Phillips indicated he was going to psychology classes which were helping. *Id.;* Doc. No. 44 at 4 (the date of this visit is misidentified as August 1, 2018). The medical report indicates that Phillips had a colonoscopy and hemorrhoidectomy scheduled. Doc. No. 46-1 at 182-185. Hickerson discontinued his Oxybutynin and Elavil pending a hemorrhoidectomy and urology appointment. *Id.* Phillips agreed to discuss with the urologist why he was not taking the Oxybutynin. *Id.* On September 19, 2018, Phillips refused a medical trip for a colonoscopy. Doc. No. 46-1 at 9.

On September 27, 2018, Woodard reviewed and approved Phillips' prescribed medications.  Doc. No. 44 at 4.

Phillips filed the complaint in this case on October 12, 2018, and the amended complaint on October 24, 2018.  Doc. Nos. 2 & 7.  After he filed this complaint, Phillips was evaluated by the urologist on December 3, 2018, and April 1, 2019.  Doc. No. 46-1 at 9.  He eventually requested to undergo the colonoscopy and hemorrhoidectomy that he had previously refused.  *Id.* at 10-11.  He underwent the colonoscopy on January 3, 2020, two benign polyps were removed, and he was diagnosed with diverticulitis.  *Id.* at 11.

At his December 3, 2018 visit with the urologist, Detrol was prescribed in place of Oxybutynin because of the constipation problems Phillips had with that drug.  Doc. No. 46-2 at 9 & 18-22.  Although Detrol was a non-formulary drug, it was eventually approved, and Phillips began to receive it in February 2019.  *Id.* at 9.  At the April 1, 2019 urology visit, Phillips' bladder ultrasound was normal, and the record reflects that Detrol had reduced Phillips' urinary symptoms, particularly the nocturia.  *Id.* at 10 & 44-48.  Phillips reported to Hickerson two days later that the Detrol had alleviated much of his urinary problems.  *Id.* at 10 & 50-55.

Phillips reported to Health Services on July 9, 2019, complaining of testicular pain.  Doc. No. 46-1 at 10 & 60-63.  Hickerson prescribed an antibiotic.  *Id.*  On follow-up, the pain had decreased and become only intermittent.  *Id.* at 10 & 72-77.

Hickerson requested an on-site consultation for the testicular pain. *Id.* By August 30, 2019, the pain had primarily resolved. *Id.* at 11 & 89-91. On October 29, 2019, Phillips had a normal testicular ultrasound. *Id.* at 11 & 97.

Dr. Te Cora Ballom is the Regional Medical Director for the BOP in the South Central Region and is the Acting Clinical Director for FCI-Forrest City. Doc. No. 46-1. She is familiar with Phillips and has reviewed his medical records, which are maintained in the ordinary course of business by the BOP. *Id.* at 2. In her affidavit in support of the defendants' summary judgment motion, she opines that while Phillips had some complications and issues after his TURP procedure, he generally had "an overall positive outcome." *Id.* at 11. She further states that nothing in Phillips' medical records suggests "that his post-surgical care fell below any standard or was in contradiction to accepted practices and the instructions from the contract urologist." *Id.* at 11-12.

Phillips has not offered expert testimony in support of his claims.

**B. Analysis: *Bivens* Claim**

Woodard and Hickerson argue that Phillips has not presented facts sufficient to show that they were deliberately indifferent to his serious medical needs.

The Eighth Amendment's proscription of cruel and unusual punishment obligates prison officials to provide adequate medical care to inmates in their custody. *Estelle v. Gamble,* 429 U.S. 97, 102–03 (1976). To succeed with an

inadequate medical care claim, an inmate must show that the prison official was deliberately indifferent to the inmate's serious medical needs. *Coleman v. Rahija,* 114 F.3d 778, 784 (8th Cir. 1997). This requires a two-part showing that (1) the inmate suffered from an objectively serious medical need, and (2) the prison official knew of the need yet deliberately disregarded it. *Id.; see also Farmer v. Brennan,* 511 U.S. at 837; *Estelle v. Gamble,* 429 U.S. 97, 105 (1976). Additionally, the Eighth Circuit has held that a "prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation." *Estate of Rosenberg by Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir. 1995). *See also Bender v. Regier*, 385 F.3d 1133, 1337 (8th Cir. 2004) (holding that negligence in diagnosis or treatment of medical condition is not sufficient to establish a constitutional violation).

The Court is satisfied that Phillips suffered from an objectively serious medical need. He developed a urinary tract infection following surgery, a complication discussed in the paperwork provided to him upon discharge from St. Francis. However, Phillips fails to establish that Woodard or Hickerson knew of the infection and deliberately disregarded it. In fact, the medical records show that when the infection was diagnosed on September 13, 2017, about one month after Phillips' TURP procedure, Hickerson prescribed Ciproflaxin, an antibiotic, for ten days. She also submitted an urgent urology consult request. Phillips' infection continued to be

evaluated by urinalysis and treated with a myriad of antibiotics, including Keflex, Macrobid, and Bactrim. Phillips was evaluated and treated for the infection on September 13 (Hickerson), September 25 (Hickerson), September 29 (Hickerson, Woodard, and emergency room visit), October 6 (Hickerson), and October 25 (Hickerson). Records of these visits document that an urgent urology consult request was pending, then approved, then finally scheduled, indicating that Hickerson was following up on the request for Phillips to see the urologist. They also document that Woodard cosigned on the medical records and was therefore aware of the treatment and medications provided to Phillips. When Phillips saw his urologist for post-surgical follow-up on November 13, 2017, he no longer had an infection, and he had been off antibiotics for one week.

It is clear that the defendants responded to the risk related to Phillips' infection, and they exercised their medical judgment by treating him with antibiotics, which ultimately resolved the infection. Phillips cannot establish deliberate indifference by Hickerson and Woodard. Additionally, the delay in getting Phillips to his urologist for a follow-up appointment does not establish deliberate indifference. Hickerson made the request when Phillips was found to have an infection, and she followed up on the status of the request at every subsequent visit until Phillips was able to see the urologist. There is no evidence that Hickerson or Woodard were responsible for scheduling follow-up visits with outside doctors, or

that they dragged their feet in trying to get Phillips to the urologist. Additionally, the defendants provided treatment for Phillips' infection on every visit before he saw the urologist and monitored his condition. Thus, there was no deliberate indifference related to the delay in getting Phillips to his urologist for a follow-up visit.

The undisputed facts also establish that the defendants were not deliberately indifferent to Phillips related to his remaining complaints. He complains that Woodard prescribed aspirin, which he was not supposed to be given. It is true that the St. Francis discharge instructions indicated that aspirin should be discontinued, and Woodard prescribed one aspirin a day when he returned to FCI-Forrest City. These facts, however, do not establish that Woodard was deliberately indifferent to Phillips' needs. At worst, she made a mistake. An inmate must show more than negligence or even gross negligence to establish a constitutional violation. *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000).

Phillips also claims that he was not given a soft chair and was not provided a special diet to minimize constipation as ordered in the instructions he received when he was discharged from St. Francis. He misinterprets those instructions. First, they are simply recommendations, not orders.[7] And the fact that Phillips did not initially receive a soft cushion chair that was never ordered does not establish that the

---

[7] Because these were recommendations only, the Court questions whether they were for treatment of a "serious medical need."

defendants were deliberately indifferent to his post-operative condition.  Second, the instructions did not state that Phillips should be provided a special diet.  In fact, he was instructed to resume a normal diet.  The instructions simply noted that an increase in fluids could reduce constipation and recommended that Phillips consume more fiber.  Thus, the defendants did not exhibit deliberate indifference by not providing Phillips a special diet.  Simply put, Phillips disagrees with the care he received post-operatively.  However, "mere disagreement with treatment decisions does not rise to the level of a constitutional violation."  *Jolly*, 205 F.3d at 1096.

Finally, Phillips claims that Hickerson ordered him to purchase stool softener which increased bleeding.  The medical records do not support this claim.  However, viewing the facts in the light most favorable to Phillips, the Court will assume Hickerson ordered Phillips to purchase stool softener.   Such an order does not establish deliberate indifference to a serious medical need.  First, Phillips fails to show that he suffered from bleeding so significant that it constituted a serious medical need.  Second, even if the bleeding constituted a serious medical need, Phillips fails to show that Hickerson deliberately disregarded such need when she ordered a stool softener, especially since the discharge instructions Phillips received when he was discharged from St. Francis indicated that his provider may wish to prescribe a stool softener.  Phillips' disagreement with Hickerson's alleged order to

take a stool softener cannot constitute deliberate indifference to serious medical needs.

For the reasons set forth above, the Court finds that the undisputed facts establish that defendants Woodard and Hickerson were aware of Phillips' serious medical needs. The Court further finds that Woodard and Hickerson did not deliberately disregard those needs. Therefore, Phillips' *Bivens* claims must fail as a matter of law.

### C. Analysis: FTCA Claim

Phillips asserts claims against the United States for medical malpractice under the FTCA. The FTCA is a limited waiver of the United States' sovereign immunity and permits lawsuits against the United States for the torts of its employees under limited circumstances. *See* 28 U.S.C. § 1346(b)(1); *Mader v. United States*, 654 F.3d 794, 797 (8th Cir. 2011). In actions arising under the FTCA, courts are bound to apply the law of the state in which the acts complained of occurred. *Glorvigen v. Cirrus Design Corp.*, 581 F.3d 737, 743 (8th Cir. 2009). It is undisputed that the medical negligence claims in Phillips' complaint address events that occurred in Arkansas at FCI-Forrest City. Thus, the Arkansas Medical Malpractice Act ("AMMA") must be applied. See Ark. Code Ann. § 16-114-206(a). According to the AMMA, in treating a patient, a medical care provider must possess and apply with reasonable care the degree of skill and learning ordinarily possessed and used

by members of her profession in good standing, engaged in the same specialty[8] in

the locality in which she practices, or in a similar locality.  *Id.*  The AMMA further

provides as follows:

> In any action for medical injury, when the asserted negligence does not
> lie within the jury's comprehension as a matter of common knowledge,
> the plaintiff shall have the burden of proving:
>
> (1) By means of expert testimony provided only by a medical care
> provider of the same specialty as the defendant, the degree of skill and
> learning ordinarily possessed and used by members of the profession of
> the medical care provider in good standing, engaged in the same type
> of practice or specialty in the locality in which he or she practices or in
> a similar locality;
>
> (2) By means of expert testimony provided only by a medical care
> provider of the same specialty as the defendant that the medical care
> provider failed to act in accordance with that standard.

Ark. Code Ann. § 16-114—206(a).  Thus, expert testimony is required "when the

standard of care is not within the jury's common knowledge and when an expert is

needed to help the jury decide the issue of negligence."  *Robbins v. Johnson*, 367

Ark. 506, 512, 241 S.W.2d 747, 751 (2006).  *See also Reagan v. City of Piggott*, 305

Ark. 77, 805 S.W.2d (1991).

---

[8] The Arkansas Supreme Court struck down the portion of the AMMA requiring
expert testimony to be given by a medical care provider of the same specialty as the
defendant.  *See Broussard v. St. Edward Mercy Health System, Inc.*, 2012 Ark. 14.

The AMMA requires expert testimony to support Phillips' malpractice claim, and he has not produced such testimony.[9]  This failure is fatal, and as a result, the United States is entitled to summary judgment on Phillips' FTCA claim.  This decision is supported by other decisions of this Court, by decisions of the Eighth Circuit Court of Appeals, and by the Supreme Court of Arkansas.  When the requisite expert testimony has not been produced "then the defendant has demonstrated that no genuine issues of material fact exist for presentation to a jury, and the defendant is entitled to judgment as a matter of law."  *Eaton v. United States of America*, 2016 WL 1029485, No. 2:14cv00116, slip op. at 2 (E.D. Ark. March 15, 2016).  *See also Rueben v. United States of America*, 2014 WL 5460574, No. 2:13cv00033 (E.D. Ark. Oct. 27, 2014); *Bellecourt v. United States*, 994 F.2d 427 (8th Cir. 1993); *Robson v. Tinnin*, 322 Ark. 605 (1995); and *Reagan v. City of Piggott*, 305 Ark. 77 (1991).

The AMMA provides a narrow exception to the need for expert testimony – when the alleged negligence lies within a jury's comprehension as a matter of common knowledge.  The medical issues of which Phillips complains involve follow-up care and treatment after a TURP procedure and complications arising from that procedure.  These issues are not matters of common knowledge which

---

[9] The discovery deadline in this matter expired on February 13, 2020.  Doc. No. 32.

would obviate the need for expert testimony. This finding is consistent with the above-cited cases, all of which found the medical conditions were not a matter of common knowledge. See *Eaton* (need for tooth extraction and delay in treatment); *Rueben* (failure to diagnose cellulitis); *Bellecourt* (failure to diagnose heart attack); *Robson* (failure to diagnose and treat fractured tooth); and *Reagan* (misdiagnosis of appendicitis). *Cf. Davis v. Kemp*, 252 Ark. 925 (1972) (a surgeon's failure to sterilize his instruments or failure to remove a sponge from an incision before closing it cited as examples of matters of common knowledge). Phillips' urological problems are complex medical issues, not matters of common knowledge, and the narrow statutory exception does not remove his burden to provide expert testimony.

Phillips has not specifically requested that the Court appoint him a medical expert. Had he done so, the Court finds that the circumstances would not warrant such an appointment. First, the Court notes that 28 U.S.C. § 1915 does not address or authorize the payment of federal money for witness fees on behalf of an indigent party in civil litigation. *See, e.g., United States v. Means*, 741 F.2d 1053 (8th Cir. 1984). The Eighth Circuit in *Means*, however, concluded that a "district court may order the United States, as a party [to litigation], to advance the fees and expenses of lay and expert witnesses **called by the court** . . ." 741 F.2d at 1059 (relying on Fed. R. Evid. 614(a) and 706(b), Fed. R. Civ. P. 54(d), and 28 U.S.C. §§ 1920 and

2412) (emphasis added).  In so finding, the Court strongly emphasized that such "discretionary power is to be exercised only under compelling circumstances."[10]  *Id.*

In a rare instance where the Eighth Circuit exercised its discretion to find an indigent inmate entitled to appointment of a medical expert, the Court noted compelling circumstances supporting the decision.  *See Spann v. Roper*, 453 F.3d 1007 (8th Cir. 2006) (*per curiam*).  In *Spann*, a case filed pursuant to 42 U.S.C. § 1983, the defendant nurse left plaintiff unattended in a cell for three hours after becoming aware she had administered a medication overdose.  The district court granted summary judgment because the plaintiff failed to offer medical evidence in support of causation.  The Eighth Circuit reversed, finding sufficient evidence to support a finding of deliberate indifference, and finding compelling circumstances existed to support the appointment of a medical expert.  453 F.3d at 1009.

Most cases do not present the compelling circumstances that existed in *Spann*. *See, e.g., Watt v. United States*, 2017 WL 4931708 (E.D. Ark. 2017) (plaintiff regularly evaluated by medical providers and was being treated; no compelling circumstances); *Eaton v. United States*, 2016 WL 1029485 (E.D. Ark. 2016) (plaintiff did not report pain or submit sick call requests; no compelling

---

[10] In *Means*, the United States was the plaintiff, and had initially paid fees for defense pretrial witnesses on several occasions.  At trial, however, the United States refused to pay for defense trial witnesses.  Under the specific circumstances, the court found that fairness "in interactions between citizens and the government" justified the exercise of its discretion.  *Id.*

circumstances); *Filpo v. United States*, 2016 WL 7115941 (E.D. Ark. 2016) (plaintiff treated on numerous occasions, was sent to specialists, and expert opined that care and treatment were within standard of care; no compelling circumstances).

The discretionary appointment of a medical expert in an inmate's FTCA medical malpractice claim was considered by United States Chief District Judge D.P. Marshall Jr. in *Rueben v. United States*, Case No. 2:13cv00033-DPM, 2014 WL 5460574 (E.D. Ark. 2014).   There, Magistrate Judge Jerome Kearney recommended, and Judge Marshall adopted, a finding that the plaintiff inmate's request for appointment of an expert witness be denied because there were no compelling circumstances to justify such an appointment.   The finding of no compelling circumstances was based on evidence that the inmate was treated numerous times by the defendants; the defendants consistently treated him for the medical condition in issue, offering medications and ordering diagnostic tests; and the defendants arranged for the inmate's transport to a local hospital for more testing and evaluation.

The facts in Phillips' case are distinguishable from *Means* and *Spann*, and much more similar to the facts of *Reuben, Watt, Eaton,* and *Filpo*.   Phillips was treated on numerous occasions at FCI-Forrest City for his post-surgical infection, and he was sent to an emergency room for additional evaluation.   Additionally, his infection resolved as a result of the antibiotic treatment FCI-Forrest City provided

him.  Finally, the defendants have provided affidavit testimony of an expert who opines that the care and treatment provided by the defendants were within the standard of care.  Under these circumstances, the Court finds that there are no compelling circumstances present that would support the appointment of an expert for the plaintiff.

In summary, Phillips alleges negligence by the medical providers in an area which is beyond the common knowledge of a juror.  The AMMA requires Phillips to provide an affidavit or declaration of an expert to support his claim.  He has not complied with this requirement.  And compelling circumstances do not exist which would justify the appointment of an expert.  As a result, the Court recommends that the United States' motion for summary judgment on Phillips' FTCA claims be granted.

## V.  Phillips' Motion for Summary Judgment

Phillips' motion for summary judgment and memorandum of law should be denied based on the above findings that the motions for summary judgment of the defendants should be granted.

## VI.  Conclusion

For the reasons stated herein, the undersigned recommends:

1.    Defendants' motions for summary judgment (Doc. Nos. 42 and 45) be granted;

2.    Phillips' motion for summary judgment (Doc. No. 49) be denied; and

3.    The complaint and amended complaint against defendants Woodard, Hickerson, and the United States be dismissed with prejudice.

SO RECOMMENDED this 24th day of August, 2020.

_____
UNITED STATES MAGISTRATE JUDGE